**WO**                                                                           JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Lamar Damar Douglas, Jr.,                    No.    CV-25-00015-TUC-SHR

                    Plaintiff,

v.                                           **ORDER**

Ryan Thornell, et al.,

                    Defendants.

      Plaintiff Lamar Damar Douglas, Jr., who is confined in the Arizona State Prison Complex (ASPC)-Eyman, has filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983 (Doc. 1) and an Application to Proceed In Forma Pauperis (Doc. 2). The Court will order Defendant Lopez to answer Count Three, order Defendant Terran to answer Count Five, and will dismiss the remaining claims and Defendants without prejudice.

**I.    Application to Proceed In Forma Pauperis and Filing Fee**

      The Court will grant Plaintiff's Application to Proceed In Forma Pauperis. 28 U.S.C. § 1915(a). Plaintiff must pay the statutory filing fee of $350.00. 28 U.S.C. § 1915(b)(1). The Court will assess an initial partial filing fee of $14.32. The remainder of the fee will be collected monthly in payments of 20% of the previous month's income credited to Plaintiff's trust account each time the amount in the account exceeds $10.00. 28 U.S.C. § 1915(b)(2). The Court will enter a separate Order requiring the appropriate government agency to collect and forward the fees according to the statutory formula.

. . . .

TERMPSREF

## II.    Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised legally frivolous or malicious claims, failed to state a claim upon which relief may be granted, or sought monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct.  *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally."  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  A "complaint [filed by a *pro se* prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

. . . .

### III.    Complaint

In his ten-count Complaint,[1] Plaintiff sues Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) Director Ryan Thornell; ASPC-Tucson employees Warden John McAdorey, Cimarron Unit Deputy Warden Defranko and Assistant Deputy Warden Lewis, Santa Rita Unit Deputy Warden Arredondo, Sergeant P. Lopez, and Correctional Officers (COs) II M. Kowalski and Terran; ASPC-Eyman Browning Unit Complex employees Warden Ibarra, Deputy Warden Rodgers, Sergeant Lohr, and CO II Earwood; and unidentified "Detention Correction Officers/Personnel" at ASPC-Tucson and ASPC-Eyman.  Plaintiff names each Defendant in his or her official and individual capacities.  Plaintiff asserts claims regarding excessive force, retaliation, property, a "hate crime," conditions of confinement, medical care, and privacy.  He seeks declaratory and monetary relief, a protection order and a contempt order, and appointment of a receiver to "watch over" him and ADCRR personnel.

In **Count One**, Plaintiff alleges the following:

On December 13, 2023, Defendant Kowalski aggressively and violently shoved Plaintiff at the front gate of yard 3, causing Plaintiff to "violently slam to the ground" and hit his head on the concrete.  (Doc. 1 at 4.)  Plaintiff felt throbbing pain in the back of his head and begged for medical attention.  (*Id.*)  Plaintiff apparently was taken to the medical unit, where he was told he had a concussion and not to sleep that night.  (*Id.*)  Plaintiff also had cuts and bruises on his elbow and was given ibuprofen.  (*Id.*)  Plaintiff claims he was not violating "any written policy []or trying to e[s]cape or putting any other staff or inmate in any danger."  (*Id.*)

On February 6, 2024, while Plaintiff was going to the legal library, Defendant Kowalski "got in front of" Plaintiff and told him he could not go to the library.  (*Id.*)

---

[1] Plaintiff identifies the bases for the Court's jurisdiction over the Complaint as 42 U.S.C. § 1983, and 28 U.S.C. §§ 1331, 1343(a), 2201, 2202, 2283, and 2284.  Section 2283 concerns a federal court's authority to issue an injunction against state proceedings. Section 2284 requires a district court of three judges to be convened when required by an Act of Congress or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.  Sections 2283 and 2284 have no relevance to Plaintiff's claims.

Defendant Kowalski said, "[N]o lawsuit, paralegal school or meeting up of the fags today." (*Id.*) Defendant Kowalski "g[ot] emotionally involved and trie[d] to trip [Plaintiff] by stomp[]ing on [the] back of [Plaintiff's] right he[e]l," causing Plaintiff to stumble. (*Id.*) Plaintiff requested a supervisor, and Defendant Kowalski initiated an Incident Command System (ICS). (*Id.*) Plaintiff "walk[ed] on free accord straight up to any other staff to protect" him from Defendant Kowalski's "violence." (*Id.*) Plaintiff "cuff[ed] up" with "no issues," and Defendant Kowalski took Plaintiff to the sergeant's office. (*Id.*)

On the way to the sergeant's office, Defendant Kowalski "knowingly secure[d]" Plaintiff, although Plaintiff had "request[ed] to get away for safety reasons." (*Id.*) Defendant Kowalski "knowingly and intentionally pushe[d] (shove[d])" Plaintiff to the ground while he was cuffed and secured. (*Id.*) Plaintiff's hand "c[ame] lo[o]se," and he "again violently smack[ed] the ground with nothing to help break [his] fall or any staff to catch or help." (*Id.* at 4–5.) While Plaintiff was on the ground, he rolled over. (*Id.* at 5.) Defendant Kowalski was "just standing over [Plaintiff] with this sm[i]rk on his face." (*Id.*) Another officer stepped in, helped Plaintiff off the ground, and told Defendant Kowalski to "stand down." (*Id.*) Plaintiff's face and left shoulder were painful and scraped from the fall. (*Id.*)

In the sergeant's office, Plaintiff told staff Defendant Kowalski had "pushed" and "ass[a]ulted" him. (*Id.*) Staff tried to tell Plaintiff, the sergeant, and Special Security Unit staff Defendant Kowalski did not push Plaintiff, and Plaintiff had fallen. (*Id.*) "Staff" threatened Plaintiff, saying Plaintiff "need[ed] to stop saying" Defendant Kowalski had assaulted him. (*Id.*) Plaintiff asked why Kowalski was allowed to escort him after he had said Kowalski "was the one [Plaintiff did not] feel safe around and had a history of ass[a]ulting [Plaintiff] already." (*Id.*) At that point, Defendant Kowalski came into the sergeant's office and heard Plaintiff say Kowalski had pushed him. (*Id.*) Kowalski said, "I only pushed you [be]cause you were trying to push me toward walking in the mud." (*Id.*) Staff heard Kowalski and told him to step back outside immediately. (*Id.*) According to Plaintiff, staff have boots or shoes that can "take mud without causing any harm, damage

or wet sock issue meaning there was no valid reason Kowalski [could not] have walked in some mud so he knowingly pushed/ass[a]ulted" Plaintiff or "horseplayed" with a prisoner "unwillingly to avoid some mud."[2]  (*Id.*)

Staff obtained medical attention for Plaintiff and kept him in a "cage . . . as a way of saying stop saying he 'assaulted you.'"  (*Id.*)  "[T]hey" tried to find a reason to "justify actions," but Plaintiff did not escape, violate any written policy, or put any prisoners or staff in any harm or danger.  (*Id.*)

As his injury, Plaintiff alleges he suffered cuts, bruises, back and nerve pain, a concussion, mental anguish, and physical damage.  (*Id.* at 4.)

In **Count Two**, Plaintiff alleges the following:

On July 25, 2024, while ADCRR staff were locking down prisoners in Plaintiff's pod, prisoners approached an officer and "told him 'to leave the pod.'"  (*Id.* at 6.)  The officer "complied with last inmate directive," and as the officer exited the pod, he looked back and saw some prisoners assaulting another prisoner.  (*Id.*)  Plaintiff saw the assault and realized the victim was his cellmate.  (*Id.*)  Plaintiff told the officer to "do something to help" his cellmate, but the officer said he could not help the cellmate.  (*Id.*)  Plaintiff told the officer to "open the door," which the officer did.  (*Id.*)  Plaintiff "charge[d] into the fight" and threw prisoners off his cellmate, although he "never punched anyone or got violent with anyone."  (*Id.*)  Plaintiff saw his cellmate "in a ball with blood everywhere." (*Id.*)  While Plaintiff stood over him, asking if he was okay, Cimarron Unit personnel "came running in."  (*Id.*)  Staff "never said anything" and "just fired [a] ta[s]er" at Plaintiff "while letting off two cans of ma[c]e (tear gas)."  (*Id.*)  Staff never said "stop" or "get on the ground."  (*Id.*)  Plaintiff was shot in the back and fell face-first into the wall and then fell to the ground.  (*Id.*)  Plaintiff was the only prisoner who was tased and at whom staff aimed

---

[2] The Court notes, on February 19, 2024, Plaintiff was found guilty of resisting or disobeying a verbal or written order, a major disciplinary violation, with a violation date of February 6, 2024.  *See* https://corrections.az.gov/inmate-data-search (search by Inmate Number 324471) (last accessed Feb. 10, 2025).

both cans of mace. (*Id.*) Staff threatened Plaintiff "with more" if he did not stop moving. (*Id.*)

Staff asked Plaintiff's cellmate what happened. (*Id.*) Plaintiff's cellmate said Plaintiff did not do anything and was the only one helping. (*Id.*) Staff realized Plaintiff was telling the truth and realized they had "knowingly and intentionally sho[]t the [black] guy and [were] wrong." (*Id.*) A sergeant came to Plaintiff and told him, "We are sorry[,] so[,] so sorry." (*Id.*) As his injury, Plaintiff alleges he had two "holes" in his back from the taser prongs, bruises and cuts on his right side from the fall, back pain, nerve damage and mental anguish. (*Id.*) Plaintiff also claims he fears staff will tase and assault him without "getting held accountable." (*Id.*)

In **Count Three**, Plaintiff alleges the following:

On October 12, 2024, Defendant Lopez and two other officers were inside Plaintiff's cell taking his personal property. (*Id.* at 7.) Plaintiff "informed the officers" his personal property was being taken. (*Id.*) "Staff saw and tried to return it," but Defendant Lopez became belligerent and used vulgar language toward Plaintiff, who was being c[al]m and ethical." (*Id.*) Defendant Lopez then got upset with Plaintiff quoting "policy 501" regarding cell searches and told Plaintiff to "get the 'fuxk' out of here before you get the hammer." (*Id.*) According to Plaintiff, the reference to "the hammer" was a threat of physical violence or "some type of sexual thing." (*Id.*)

Defendant Lopez started grabbing Plaintiff's books and exams from the Blackstone Career Institute and then "really started getting aggre[s]sive and combative." (*Id.*) Plaintiff asked Defendant Lopez to put the items down because they were personal. (*Id.*) Defendant Lopez told Plaintiff he was the sergeant and could do whatever he wanted to do, take what he wanted and "just contraband it," and Plaintiff could "gr[ie]ve it to get it back." (*Id.*) Plaintiff entered the doorway to privately speak with Defendant Lopez about his professionalism, ethics, and accountability as sergeant. (*Id.*) Plaintiff told Defendant Lopez this was "all unfair and out of procedure and policy guidelines" and Lopez was failing as a supervisor. (*Id.*) Defendant Lopez said, "ok 'hammer.'" (*Id.*)

Defendant Lopez "charge[d] with one hand crossed as to use [his] elbow as [a] ram and drove it right into" Plaintiff's throat. (*Id.*) Plaintiff retreated and told Defendant Lopez and the other officers, "get off," and "get him off me." (*Id.* at 8.) At some point, Plaintiff was "unable to retreat anymore due to top rail being the only step left that would make [him] go over the top," and, fearing falling over or being thrown over the rail, Plaintiff "planted [his] retreating foot" and "protected [him]self with enough force to stop" Defendant Lopez's "charge." (*Id.*) Defendant Lopez fell, and Plaintiff "wrapped [Defendant] Lopez up," yelling at the other two officers to "get him" so Plaintiff could let him go. (*Id.*) Plaintiff never made any threatening or harmful contact with Defendant Lopez while he was "wrapped up." (*Id.*)

Without any warning or directive, an officer tased Plaintiff in the back, and Plaintiff immediately went limp on top of Defendant Lopez. (*Id.*) Plaintiff then fell to the floor, and Lopez got on top of Plaintiff with his knee on Plaintiff's neck and told Plaintiff "and population" Plaintiff "hits like a 'bxxxx'" and "should have done more," trying to provoke Plaintiff to fight or resist more. (*Id.*) The other two officers "just stood by" as Defendant Lopez got flustered and acted unprofessionally by taking personal "shots" at Plaintiff. (*Id.*) The other officers "never stepped in[]" to stop Lopez or tell him to calm down because Lopez was the supervisor, and the other officers were afraid for their jobs. (*Id.*) According to Plaintiff, Defendant Lopez told the officers, "[W]e need to get our story right." (*Id.*)

As his injury, Plaintiff alleges he suffered cuts, bruises, and scrapes and had two "holes" in his back, nerve pain and damage from being tased twice in 60 days, and mental pain. (*Id.* at 7.)

In **Count Four**, Plaintiff alleges the following:

On December 14, 2024, Plaintiff's cellmate needed medical attention. (*Id.* at 9.) An ICS was activated, and Defendant Earwood and two other non-party officers responded. (*Id.*) Defendant Earwood "started the interaction very unprofessional[ly]" and told Plaintiff's cellmate he was only going to the medical unit in a "strap chair." (*Id.*) Plaintiff's cellmate said he was fine to walk, but Defendant Earwood "wasn't having it" and kept

stating, "'chair' or you refuse." (*Id.*)  Defendant Earwood turned around and "started telling other staff to get into tact[ical] positions" and "inmates were going to get violent." (*Id.*)  Plaintiff "heard and requested to spea[]k with a shift supervisor" as soon as possible. (*Id.*)  Defendant Lohr arrived, and Plaintiff asked why there was no camera. (*Id.*)  Defendant Lohr stated there were two other ICSs in progress and the camera was in use. (*Id.*)  Plaintiff explained Defendant Earwood was being belligerent and trying to "provoke inmates" and "telling staff to take tactical positions." (*Id.*)  Plaintiff opened his tablet and "showed policy and injunction" to Defendant Lohr "about how he was supervisor and was supposed to make sure orders are being followed." (*Id.*)  Defendant Lohr did not "like this," asked Plaintiff his name, and "walked off." (*Id.*)

"They" brought Plaintiff's cellmate back with a camera and recorded staff asking Plaintiff to cuff up and opening the door, Plaintiff's cellmate entering the cell and having his handcuffs removed, and the staff leaving. (*Id.*)  Plaintiff "yell[ed] for staff to come back to take off [his] cuffs." (*Id.*)  According to Plaintiff, the "custom" is if two prisoners are cuffed, they are uncuffed at the same time. (*Id.*)  Staff "did multiple walks[,] stopping at [Plaintiff's] cell door," and Plaintiff asked if they could remove the handcuffs, but "they all ke[pt] walking." (*Id.*)  Plaintiff was left handcuffed for seven hours. (*Id.*)  Plaintiff's cellmate had to help Plaintiff eat, drink, and use the bathroom. (*Id.*)

As his injury, Plaintiff alleges his wrists were bruised because the cuffs were too tight, and he suffers post-traumatic stress disorder every time staff tries to handcuff him because he fears they will "leave them on." (*Id.* at 10.)

In **Count Five**, Plaintiff alleges the following:

On October 12, 2024, Defendant Terran and another CO II were transporting Plaintiff to the CDU "pending two-way for another issue with [Defendant] Lopez." (*Id.* at 11.)  On the way, Defendant Terran told Plaintiff, "Lopez is my boy[,] you lucky I wasn't here." (*Id.*)  Plaintiff asked, "what do you mean by that[?]" (*Id.*)  Terran responded, "You know what I mean, if I was there I would have beat you." (*Id.*)  Plaintiff said, "why would you get involved[,] that issue is over and no one got jumped[,] he ass[a]ulted me and I

protected my[]self.  Nothing extra nothing more [than] self[-]defen[s]e." (*Id.*)  Defendant Terran said, "We[]ll what if it was one of your 'boys/homies[?]'" (*Id.*)  Plaintiff responded if it was one on one, he would "let it be and tell them shake hands." (*Id.*)  Terran said, "naw we would have just jumped you or I would have hand[]led you alone." (*Id.*)  Plaintiff told Terran, "You[ are] being as unprofessional as he was being right now." (*Id.*)  Terran told Plaintiff they were "talking as men no[t] boys" and to "leave the issue off paper if [Plaintiff] knew what was best for [him]." (*Id.*)  Plaintiff was told, "[Y]ou put your hands on one of us, you[ are] lucky all you lose was only your property you have nothing coming." (*Id.*)

As his injury, Plaintiff alleges he was threatened and told not to "do any paperwork on it (grievance)." (*Id.* at 12.)  Plaintiff claims "[t]hey only did it as a get back or get even" to make him afraid for his well-being. (*Id.*)

In **Count Six**, Plaintiff alleges the following:

On October 12, 2024, Plaintiff was unable to personally pack up his property. (*Id.* at 13.)  Staff radioed yard 3 and told "them" to have Plaintiff's cellmate pack up his property. (*Id.*)  Plaintiff's property did not "show up" for more than two hours. (*Id.*)  Under ADCRR Department Order 909, staff are not permitted to allow other prisoners to pack a prisoner's property. (*Id.*)  According to Plaintiff, it is a "well known custom" for prisoners to steal or take property that does not belong to them when the owner is being detained by staff "after getting ta[s]ed" and staff announces a prisoner is not returning to his cell before the end of the night. (*Id.*)  Plaintiff "grieved it," and "they" responded there was no property in his file. (*Id.*)  Defendant Terran told Plaintiff, "you got nothing from us." (*Id.*)

Plaintiff alleges staff knowingly and willingly allowed his property to be taken. (*Id.*)  He asserts from November to January, ADCRR has "taken money" from him for property he does not have when, per staff, all he has on file is a tablet, which is exempt from monthly charges. (*Id.*)  Plaintiff claims on November 20, 2024, he "ordered property," but he never received it, and "they" charged him for it. (*Id.*)  Plaintiff alleges he has spoken with property staff at Cimmaron Unit and Eyman Complex, but they are "lo[]sing" or "misplacing" his property with no consequence for their actions. (*Id.* at 14.)

In **Count Seven**, Plaintiff alleges the following:

Since Plaintiff "learned of [the] injunction" in July 2024, he has "informed the population of the rights and duties of the [] Defendants." (*Id.* at 15.) Plaintiff has submitted informal complaints and grievances regarding staff's failure to abide by the injunction, and staff have responded "close custody 14" was not a part of the subclass. (*Id.*) Plaintiff "would explain . . . per order" he "was included within due to what Defendant was failing to do." (*Id.*) Plaintiff continues to "inform[]" and complain to "[D]efendant" about "knowingly violating injunction." (*Id.*) Since Plaintiff started "holding, informing, [and] gathering information" about how "Defend[a]nt" is violating the injunction, he has been moved from unit to unit, tased twice, and assaulted by staff twice, and his property has been taken, lost, or destroyed. (*Id.*) Plaintiff has also received multiple incident reports to try to "max" him out and has had seven tickets overturned. (*Id.*) Plaintiff has requested reclassification for a new "IR/classification score (per injunction)," but "Defendant" has stated Plaintiff is "misinformed" and he "has only one classification score." (*Id.*)

In **Count Eight**, Plaintiff alleges from January 2024 to the present, he has been singled out because he has been an advocate for the LGBTQI community on every unit he has been on. (*Id.* at 16.) Plaintiff and another prisoner were moved from Santa Rita Unit to Rincon Unit, and CO IV Payne and CO II Barker—whom Plaintiff has not named as Defendants—singled Plaintiff and the other prisoner out every chance they had by writing disciplinary tickets and activating ICSs. (*Id.*) Staff and prisoners knew Plaintiff and the other prisoner were a couple, but staff only singled them out, and did not punish "the others" or other LGBTQI prisoners who were dating, "sleeping around," or had ICSs for sexual contact. (*Id.*) Plaintiff and the other prisoner were "told to [their] face by ADW, DW, CO III, CO IV SSU-Welch, [and] Wilkins" they were being targeted because of their sexual orientation. (*Id.*) Staff have made "really degrading" statements because of Plaintiff's orientation, such as "why don[']t you just be straight and stop all this gay, fag, homo stuff." (*Id.*)

1    In **Count Nine**, Plaintiff alleges since October 12, 2024, he has been in one

2    detention unit (CDU) after another.  (*Id.* at 17.)  From October 12 to 29, 2024, while he

3    was in Cimarron Unit's CDU, Plaintiff "kept telling and showing staff that the food [was

4    not] correct" in terms of portion size.  (*Id.*)  Staff told Plaintiff, "Don[']t come to CDU

5    then," or, "My supervi[s]or DW knows and ordered me to serve this."  (*Id.*)

6    On October 29, 2024, Plaintiff was moved to Browning Unit.  (*Id.*)  Since Plaintiff's

7    arrival, non-party Sergeant Marrow has been "notified countless times," through

8    grievances and in person, the food is "not correct."  (*Id.*)  Sergeant Marrow's response is,

9    "this is max and you guys don't get certain things due to inmate[s] catching bot[]ulism."

10    (*Id.*)  Sergeant Marrow's staff "know[s] fully well" prisoners in Browning Unit are not

11    getting full nutritional and caloric content and are deliberately failing to supplement the

12    food "with anything else."  (*Id.*)

13    All winter, Plaintiff asked staff for a state-issued jacket for outdoor recreation and

14    was told such a provision is above staff's "pay grade." (*Id.*)  Plaintiff has "asked medical to

15    help" because the cold weather increases the risk of sickness, but "they" say "just don[']t

16    go out." (*Id.*)  Complex and Unit Deputy Wardens assigned Sergeant Marrow as detention

17    supervisor, and since Marrow has been in that position, Plaintiff has never received 10

18    hours of recreation in any week or 14 hours or more of out-of-cell time in a week.  (*Id.*)

19    Between December 17 and 20, 2024, there was no recreation or classes, and between

20    December 22 and 24, 2024, prisoners were not allowed to shower.  (*Id.*)  It is "more

21    common th[a]n not" for prisoners to spend 24 to 72 hours nonstop in their cells.  (*Id.*)

22    Plaintiff's pod has spiderwebs "all in the ce[i]ling," and the showers are scrubbed

23    "for [the] camera," but are never cleaned.  (*Id.*)  Sewage backs up into the shower.  (*Id.* at

24    18.)  Sergeant Marrow "is notified," and "paperwork is filed," notifying Administration of

25    the conditions of confinement.  (*Id.*)  Plaintiff has told "all kinds of staff" and non-party

26    Deputy Warden Martinez about the conditions.  (*Id.*)

27    Medical staff have improperly treated Plaintiff's "foot issue" for three years and

28    cannot diagnose it but want to send him to a specialist to get a second diagnosis.  (*Id.*)

Plaintiff's foot is getting worse, and he apparently has two abscesses, but "no one wants to ask for outside help." (*Id.*)

In **Count Ten**, Plaintiff alleges the following:

Plaintiff is in segregation at Browning Unit, which is a maximum custody unit. (*Id.* at 19.) Staff call Browning Unit a "hands on" unit, which means staff personally observe and escort prisoners everywhere while they always keep one hand on the prisoner. (*Id.*) Whenever Plaintiff goes to the medical unit or to or from recreation, he is stripped and told to bend at the waist, reach back, spread his buttocks, squat and cough, lift each foot, and lift his genitals. (*Id.*) Staff also "wand" Plaintiff, check his clothes, and watch him get dressed. (*Id.*) If Plaintiff refuses to strip, he forfeits recreation, medical appointments, and any out-of-cell activity. (*Id.*) Plaintiff claims strip-searching is "just to sexually harass and humil[i]ate" him, which violates the Prison Rape Elimination Act (PREA) and ADCRR policy. (*Id.*)

Plaintiff also alleges there are cameras in the showers, in violation of his "PREA and privacy right[s]." (*Id.*) Plaintiff asserts male and female staff have "waved" and seen Plaintiff fully nude in the shower because there are no curtains or doors in the shower. (*Id.*) Plaintiff contends there are "no real penological or security reasons to do both strip and wand" when he is escorted everywhere, never let out of arm's reach or sight of staff, and is always handcuffed when he is out of his cell. (*Id.* at 20.)

**IV.    Discussion**

To prevail on a § 1983 claim, a plaintiff must show (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163–64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)). In addition, a plaintiff must allege he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371–72, 377 (1976).

Although pro se pleadings are liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), conclusory and vague allegations will not support a cause of action, *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).  Further, "a liberal interpretation of a civil rights complaint may not supply essential elements of the claim not initially pled." *Id*.

## A.     Individual versus Official Capacity

Plaintiff names Defendants in their individual and official capacities.  A suit against a defendant in his or her *individual* capacity seeks to impose personal liability upon the official. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).  By comparison, a suit against a defendant in his or her *official* capacity represents only another way of pleading an action against the entity that employs the defendant.  *Id.* at 165.  That is, the real party in interest is not the named defendant, but the entity that employs the defendant.  *Id.*  To bring a claim against an individual in his official capacity, a plaintiff must show the constitutional deprivation resulted from the entity's policy, custom, or practice.  *Id.*; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).

Plaintiff cannot maintain a lawsuit for damages against ADCRR employees in their official capacities.  *See Hafer v. Melo*, 502 U.S. 21, 27 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *see also Gilbreath v. Cutter Biological, Inc.*, 931 F.2d 1320, 1327 (9th Cir. 1991) ("[A] state is not a 'person' for purposes of section 1983.  Likewise[,] 'arms of the State' such as the Arizona Department of Corrections are not 'persons' under section 1983." (internal citation and citation omitted)).

Plaintiff may maintain a lawsuit against ADCRR employees in their official

capacity for *prospective* declaratory and injunctive relief because under the doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment "does not . . . bar actions for prospective declaratory or injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Coal. to Defend Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012).

Here, Plaintiff has failed to state an official capacity claim. "[I]n an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law." *Graham*, 473 U.S. at 166; *see also Los Angeles County v. Humphries*, 562 U.S. 29, 39 (2010) ("[The] 'policy or custom' requirement [from *Monell*] applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective."). A plaintiff must allege the policy or custom caused him to suffer constitutional injury. *Sadoski v. Mosley*, 435 F.3d 1076, 1080 (9th Cir. 2006). Plaintiff does not allege any of his injuries were the result of a specific ADCRR policy, procedure, or custom. The Court will therefore dismiss Plaintiff's official-capacity claims.

## B. Defendants Thornell, McAdorey, Defranko, Lewis, Arredondo, Rodgers, and Ibarra

There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *See Monell*, 436 U.S. at 691; *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has not alleged Defendants Thornell, McAdorey, Defranko, Lewis, Arredondo, Rodgers, and Ibarra personally participated in a deprivation of Plaintiff's constitutional rights, were aware of a deprivation and failed to act, or formed policies that resulted in Plaintiff's injuries. Plaintiff has made no allegations at all against these

1   Defendants.   Thus, the Court will dismiss without prejudice Defendants Thornell,
2   McAdorey, Defranko, Lewis, Arredondo, Rodgers, and Ibarra.

3   **C.    Excessive Force**

4   When an inmate claims prison officials violated his Eighth Amendment rights by
5   using excessive physical force, the relevant inquiry is "whether force was applied in a good-
6   faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."
7   *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  However, as the Supreme Court has made it
8   clear, not every use of physical force violates the Eighth Amendment:

> That is not to say that every malevolent touch by a prison guard
> gives rise to a federal cause of action.  *See Johnson v. Glick*,
> 481 F.2d [1028, 1033 (2nd Cir. 1973)] ("Not every push or
> shove, even if it may later seem unnecessary in the peace of a
> judge's chambers, violates a prisoner's constitutional rights").

13  *Id.* at 9.

14  **1.    Count One**

15  Insofar as Count One involves an alleged use of excessive force during the
16  December 13, 2023 incident, Plaintiff's allegations are too vague to state a claim.  Plaintiff
17  does not identify what occurred immediately before Defendant Kowalski allegedly shoved
18  Plaintiff, so the Court cannot reasonably infer the force used by Kowalski was excessive.

19  Plaintiff also fails to state an excessive force claim with respect to the alleged
20  February 2024 incident.   Plaintiff's allegations indicate he tried to push Defendant
21  Kowalski into mud—or at least that Kowalski perceived Plaintiff tried to do so—and
22  Kowalski pushed Plaintiff back, causing Plaintiff to fall but not, apparently, to suffer any
23  injuries.  This does not amount to an Eighth Amendment violation.  As presented, Plaintiff
24  fails to state an excessive force claim in Count One, and it will be dismissed.

25  **2.    Count Two**

26  Plaintiff does not connect any of the allegations in Count Two to any named
27  Defendant.  Plaintiff therefore fails to state a claim in Count Two, and it will be dismissed.
28  . . . .

### 3.    Count Three

Liberally construed, Plaintiff states an Eighth Amendment excessive force claim against Defendant Lopez in his individual capacity.  The Court will require Defendant Lopez to answer Count Three.

### 4.    Count Four

In Count Four, Plaintiff does not allege Defendant Earwood used any force against him, let alone physical force.  Plaintiff therefore fails to state an excessive force claim against Defendant Earwood.

Plaintiff alleges Defendant Lohr left Plaintiff handcuffed for seven hours, which caused bruising to Plaintiff's wrists.  However, Plaintiff does not allege he told Defendant Lohr the handcuffs were too tight, and he does not identify Defendant Lohr as one of the staff members whom he asked to remove the handcuffs.  As presented, Plaintiff fails to state a claim in Count Four, and it will be dismissed.

### D.    Retaliation

A viable claim of First Amendment retaliation contains five basic elements: (1) a state actor took some adverse action against an inmate (2) because of (3) the inmate's protected conduct, and such action (4) chilled the inmate's exercise of his First Amendment rights (or the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (explaining a retaliation claim requires an inmate to show (1) the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) the action "advanced no legitimate penological interest").  The plaintiff has the burden of demonstrating his exercise of First Amendment rights was a substantial or motivating factor behind the defendants' conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th

Cir. 2012).  "The filing of an inmate grievance is protected conduct."  *Id.*  "A retaliation claim may assert an injury no more tangible than a chilling effect on First Amendment rights," and "the mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect."  *Brodheim v. Cry*, 584 F.3d 1262, 1269–70 (9th Cir. 2009) (citation omitted).

### 1.    Count Five

Liberally construed, Plaintiff states a First Amendment retaliation claim in Count Five against Defendant Terran in his individual capacity.  The Court will require Defendant Terran to answer Count Five.

### 2.    Count Seven

Plaintiff does not specifically connect any of the allegations in Count Seven to any named Defendant.  Plaintiff has therefore failed to state a claim in Count Seven, and it will be dismissed.

### E.    Count Six

In Count Six, Plaintiff alleges his property was taken after officers left it unsecured.  Plaintiff's claim regarding his property would arise, if at all, under the Due Process Clause of the Fourteenth Amendment.  However, the "Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  Even unauthorized intentional deprivations of property do not constitute a violation of procedural requirements of the Due Process Clause if a meaningful post-deprivation remedy for the loss is available.  *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  The availability of a common-law tort suit against a state employee constitutes an adequate post-deprivation remedy.  *Id.* at 534–35.  Moreover, Arizona provides a meaningful and adequate post-deprivation remedy through the prison grievance system, specifically Department Order 909(8.0).  *Dennison v. Ryan*, 522 F. App'x 414, 417–18 (9th Cir. 2013); *Aldrete v. Ariz. Dep't of Corr.*, 2011 WL 30959, at *7 (D. Ariz. Jan. 3, 2011); *see also Wright v. Riveland*, 219 F.3d 905, 918 (9th Cir. 2000) (recognizing both state tort claims *and* prison grievance procedures provide adequate post-

deprivation remedies).  Plaintiff has not stated a § 1983 claim based on the loss of his property.  The Court will therefore dismiss Count Six.

### F.    Counts Eight, Nine, and Ten

Plaintiff does not connect any of the allegations in Counts Eight, Nine, and Ten to any named Defendant.  Plaintiff makes allegations in these Counts against CO IV Payne, CO II Barker, CO II Sandoval, Sergeant Marrow, and Deputy Warden Martinez, but he has not named these individuals as Defendants.  The Court will therefore dismiss Counts Eight, Nine, and Ten.

## V.    Warnings

### A.    Release

If Plaintiff is released while this case remains pending, and the filing fee has not been paid in full, Plaintiff must, within 30 days of his release, either (1) notify the Court he intends to pay the unpaid balance of his filing fee within 120 days of his release or (2) file a non-prisoner application to proceed in forma pauperis.  Failure to comply may result in dismissal of this action.

### B.    Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

### C.    Copies

Because Plaintiff is currently confined in an Arizona Department of Corrections, Rehabilitation & Reentry Complex or Private Facility subject to General Order 23-19, Plaintiff can comply with Federal Rule of Civil Procedure 5(d) by including, with every document Plaintiff files, a certificate of service stating this case is subject to General Order 23-19 and indicating the date the document was delivered to prison officials for filing with the Court.  Plaintiff is not required serve Defendants with copies of every document or provide an additional copy of every document for the Court's use.

**TERMPSREF**

**If** Plaintiff is transferred to a facility other than one subject to General Order 23-19, Plaintiff will be required to: (a) serve Defendants, or counsel if an appearance has been entered, a copy of every document Plaintiff files, and include a certificate stating a copy of the filing was served; and (b) submit an additional copy of every filing for use by the Court. *See* Fed. R. Civ. P. 5(a) and (d); LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

### D.    Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260–61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)    Plaintiff's Application to Proceed In Forma Pauperis (Doc. 2) is **granted**.

(2)    As required by the accompanying Order to the appropriate government agency, Plaintiff must pay the $350.00 filing fee and is assessed an initial partial filing fee of $14.32.

(3)    Plaintiff's official-capacity claims are **dismissed**.

(4)    Counts One, Two, Four, and Six through Ten are **dismissed without prejudice**.

(5)    Defendants Thornell, McAdorey, Defranko, Lewis, Arredondo, Kowalski, Ibarra, Rodgers, Lohr, and Earwood are **dismissed without prejudice**.

(6)    If Plaintiff attempts to amend to address the shortcomings identified in this Order, the amended complaint must be filed on the court-approved form and retyped or rewritten in its entirety (including those claims and Defendants that were not dismissed), and Plaintiff must comply with Rule 15 of the Federal Rules of Civil Procedure and Rule 15.1 of the Local Rules of Civil Procedure.

(7)    Defendant Lopez must answer the Eighth Amendment excessive force claim in Count Three.  Defendant Terran must answer the First Amendment retaliation claim in Count Five.

(8)    The Clerk of Court must send Plaintiff a service packet including the Complaint (Doc. 1), this Order, and both summons and request for waiver forms for Defendants Lopez and Terran.

(9)    Plaintiff must complete[3] and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(10)   If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(11)   The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(12)   The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.

(13)   A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

---

[3] If a Defendant is an officer or employee of the Arizona Department of Corrections, Rehabilitation & Reentry, Plaintiff must list the address of the specific institution where the officer or employee works.  Service cannot be effected on an officer or employee at the Central Office of the Arizona Department of Corrections, Rehabilitation & Reentry unless the officer or employee works there.

(14)    The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

>    (a)    personally serve copies of the Summons, Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

>    (b)    within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(15)    Defendants Lopez and Terran must answer the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(16)    Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

Dated this 8th day of July, 2025.

Honorable Scott H. Rash
United States District Judge